J-S03002-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: N.V.D.P.-B. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 922 WDA 2020 |

Appeal from the Order Entered July 29, 2020
In the Court of Common Pleas of Cambria County Orphans' Court at
No(s):  No. 2020-288 IVT

BEFORE:   DUBOW, J., MURRAY, J., and STRASSBURGER, J.[*]

MEMORANDUM BY DUBOW, J.:                    **FILED FEBRUARY 26, 2021**

M.P. ("Mother") appeals the July 29, 2020 Order involuntarily terminating her parental rights to her minor child, N.V.D.P.-B. (born November 2015) ("Child").[1]  Because the record supports the decision of the trial court, we affirm the Order.

We glean the following summary of the relevant facts from the trial court's July 29, 2020 Order and the certified record.  On February 21, 2018, Child's six-year-old half-sibling called 911 to report that Mother would not wake up. EMS responded and reported that Mother had suffered a suspected drug overdose. Police officers called Cambria County Children and Youth

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] In the same Order, the court also involuntarily terminated the parental rights of Child's father, D.B. ("Father").  Father is not a party in this appeal.

Services ("CYS"), which obtained an Emergency Order and removed Child, who was then two years old, and Child's three half-siblings from Mother's home.[2] "When a CYS representative went to the home, pill bottles, thousands of empty [heroin] stamp bags, and [used and new] needles were strewn about the house all within reach of the [C]hildren." Trial Court Order, 7/29/20, at 2 (citation omitted). In addition, the children's and Mother's bedrooms and bathrooms were in complete disarray, with clothes, papers, and trash bags strewn about. However, "Mother denied she had a drug problem." *Id.* After a shelter care hearing on February 26, 2018, the court granted legal and physical custody of Child to CYS. CYS placed Child in foster care, where Child remains with his pre-adoptive family.

On March 9, 2018, the trial court adjudicated Child dependent, set the permanency goal at return to parent, with a concurrent goal of placement with a fit and willing relative. The court approved a family service plan for Mother that contained several objectives, including intensive drug and alcohol treatment, and cleaning up and maintaining her home to make it suitable for habitation. CYS connected her with various services to help her with the objectives. The court held regular dependency hearings, discussed *infra*.

In November 2018, Mother left Pennsylvania to work for a cell phone tower company in Tennessee with Child's father. She returned in December 2018, then left again in January 2019 to work with Child's father in Florida.

---

[2] Child's three half-siblings are not part of this appeal.

While she was working out of state, Mother returned to Pennsylvania once a month to participate in dependency hearings and to see her children for eight hours, sometimes spread out over two consecutive days. She initially pursued drug and alcohol counseling, however, once she left the state, Mother failed to maintain counseling consistently and did not seek the recommended intensive drug and alcohol counseling.

Mother returned to Pennsylvania in April 2019. On May 23, 2019, Mother pled guilty to four counts of Recklessly Endangering Another Person ("REAP") in connection with the February 21, 2018 incident. The court sentenced her to 23 months' probation and attendance at the Day Reporting Center ("DRC"), an intensive outpatient drug and alcohol facility.

In late June 2019, Mother twice tested positive for opioids and alcohol in her urine in violation of her DRC sentence, and the court sentenced her to three months' incarceration. Upon her release from jail after two months, Mother participated in her DRC program without any positive drug tests. In January 2020, Mother began working with SKILLS, a drug and alcohol rehabilitation service.

The juvenile court held regular dependency hearings between March 2018 and March 2020. Although Mother initially showed progress toward meeting her goals by cleaning and organizing her home, Mother failed to engage in adequate drug and alcohol treatment until after she was

incarcerated in 2019.[3] In addition, although Mother's supervised visits with Child went well, after the fourth permanency review hearing in November of 2019, the trial court ordered the visits suspended until Mother successfully completed an intensive drug and alcohol program. The court also changed the permanency goal to Adoption at that time. At the last permanency hearing held in early 2020, the court concluded Mother had made no progress toward eliminating the circumstances which necessitated Child's removal and placement.

On March 24, 2020, CYS filed a Petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2311(a)(1), (2), (5), and (8), and (b). The court appointed Richard Corcoran, Esq., to represent Mother and Suzann M. Lehmire, Esq., to represent Child. The court held evidentiary hearings on the Petition on July 20, 2020, and July 23, 2020. CYS presented testimony from: CYS caseworkers Stephen Nelson and Sabrina Uebel; psychologist Dennis Kashurba; and Brooke Schreyer, an employee of JusticeWorks Youth Care ("JusticeWorks") which provided in-home services to the family; Brittany Winkelman, a drug and alcohol Recovery Coach with Independent Family Services ("IFS"); and Tony White, the Director of the DRC. Finally, CYS presented testimony from Jeffrey Grove, who is employed

_____

[3] Mother did not begin drug counseling until CYS promised her an increase in visits from one hour to two hours every two weeks. N.T., 7/20/20, at 41.

by Bair Foundation at Path House, a foster care agency that assists parents with visitation and parenting skills.

CYS caseworker Nelson testified regarding, *inter alia*, the services put in place to help Mother meet her family service plan objectives and her limited participation in those services. **See** N.T., 7/20/20, at 5-74. He stated that between February 22, 2018, and August 1, 2018, Mother tested positive for norfentanyl, morphine, heroin, and/or oxycodone seven times. **Id**. at 49-52. Thereafter, Mother had a couple drug screens testing positive for morphine, which she explained was due to prescriptions because of kidney stones and a dislocated knee. **Id**. A couple tests revealed alcohol which Mother attributed to Nyquil and attendance at church. **Id**. Mr. Nelson concluded that because the agency was still concerned about Mother's housing, her connection to Child's father, the little progress over the 29 months prior to hearing, and the length of time Child has been in foster care, that it would be in Child's best interests to sever Mother's parental rights. **Id**. at 44.

Mr. Kashurba, who performed a psychological evaluation of Mother, testified regarding, among other things, Mother's minimization of her drug and alcohol use and her denial of the issues leading to the removal of her children. N.T. 79-80; **see also** Pet. Exh. 1 (Report of Dennis M. Kashurba, dated 4/2/2018, at 5 (diagnosing, *inter alia*, opioid and alcohol use disorder)).

Ms. Shreyer from JusticeWorks testified that Mother participated in its home maintenance program to organize and declutter her home until Mother

left the state in November 2018. When Mother returned to the area in Spring 2019, JusticeWorks reinstated her case at the behest of CYS, but Mother refused to avail herself of their services, which would have included finding suitable housing for her and helping find her a job. After June 2019, JusticeWorks had no contact with Mother, and CYS asked it to close her case due to lack of compliance. *Id*. at 91-94, 97.

Drug and Alcohol Recovery Coach Ms. Winkelman testified that in August 2018 she attempted to work with Mother but Mother refused services. Specifically, Mother would not acknowledge any type of drug or alcohol addiction, denied that the drugs and drug paraphernalia found in her house in February 2018 were hers, refused to sign releases, and refused to participate in a pill count of her allegedly prescribed pain medications. *See id*. at 103-08.

Ms. White, the director of the DRC, testified that, most recently, Mother began the program in September 2019 and successfully completed the program on March 10, 2020. *See* N.T., 7/23/20, at 4-7, 10-11.

Mr. Grove testified that he worked with Mother and Child beginning in September 2018 at Path House, a facility in Cambria County providing visitation supervision and assistance with parenting skills. *Id*. at 21-22. Mr. Grove testified that Mother tested positive twice for morphine, and once for alcohol, which Mother attributed to prescription hydrocodone for a dislocated knee and NyQuil taken the night before. *Id*. at 24-25. Mr. Grove further

testified that Mother's interactions with Child were appropriate and stated that he believed that Mother and Child had a parent-child bond, but he was concerned that Mother never openly accepted responsibility for her situation and the placement of her children. *Id*. at 23, 24, 29, 33. Mr. Grove also testified that Child is "very much bonded" to his foster family, he looks to them to fulfill his parental needs, and that "he's thriving in [his foster] home at this time." *Id*. at 28, 37. He also testified that since visits with Mother were suspended, Child's behavior improved. *Id*. at 38.

Mother testified on her own behalf, stating, *inter alia*, that the heroin bags strewn throughout the house in February 2018 belonged to Child's father and were from 2016; she stated that she not moved them because she had been afraid to touch them. *Id*. at 45, 82. She also acknowledged, however, that she and Child's father had used heroin together but stated that she was not actively using in February 2018. *Id*. at 65-66, 82. Mother testified that after the children were removed, CYS recommended she attend drug and alcohol treatment, so she contacted Beal Counseling in Somerset where she had previously been in counseling. *Id*. at 47.

Mother testified that in September 2019 upon her release from incarceration, she reengaged the services of DRC and completed the program in March 2020. She further testified that she was currently enrolled in the SKILLS program for drug and alcohol treatment. Mother also acknowledged that she had been in denial that she had a drug and alcohol problem and

recognized that up until July 2019, she did not properly treat her drug and alcohol problems. *Id*. at 74. She stated that DRC and Skills helped her to see that she did have a problem and she continued to work on herself. *Id*. at 54-56. She also acknowledged that she had not been open and honest with CYS. *Id*. at 77-78.

Mother testified that she currently lives in a two-bedroom house in Portage owned by her father and that most of her and the children's belongings are in storage. *Id*. at 61-63, 85. Mother explained that she does not pay rent or a mortgage, but she does pay the utilities in her home. *Id*. at 63. Mother further testified that she is currently working at McDonald's but hoped to have her nursing license reinstated in the future.[4]

On July 29, 2020, the court entered an Order terminating Mother's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(1), (2), and (b).

Mother timely appealed and complied with Pa.R.A.P. 1925. In lieu of a Rule 1925(a) Opinion, the trial court relied on its July 29, 2020 Opinion.

**ISSUE ON APPEAL**

Mother raises the following issue for our review:

> Whether the Petitioner, Cambria County Children and Youth
> Services, had met its burden of terminating Mother's parental

---

[4] Mother has an RN degree and Master's degree and practiced as a registered nurse for eight years until 2009. Her nursing license was suspended as a result of her DUI conviction in 2015. She testified at the termination hearing that she has kept up with her continuing education requirements, notwithstanding the suspension of her license. N.T., 7/23/20, at 80.

rights by clear and convincing evidence in that the Trial Court erred in applying the appropriate statutory factors.

Mother's Brief at 4.

**LEGAL ANALYSIS**

In reviewing cases in which the orphans' court involuntarily terminated parental rights, appellate courts must accept the findings of fact and credibility determinations of the orphans' court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). If the record supports the factual findings, appellate courts then determine if the orphans' court made an error of law or abused its discretion. *Id.* Where the competent record evidence supports the court's findings, we must affirm the orphans' court decree even though the record could support an opposite result. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

"The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73–74 (Pa. Super. 2004) (citations omitted). Appellate courts defer to the orphans' court that often has "first-hand observations of the parties spanning multiple hearings." *In re T.S.M.*, *supra* at 267 (citations and quotation marks omitted). Importantly, "[t]he court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time . . . in which to **complete**

- 9 -

the process of either reunification or adoption for a child who has been placed in foster care." ***In re Adoption of R.J.S.****,* 901 A.2d 502, 513 (Pa. Super. 2006) (emphasis in original; citations omitted).

In addressing petitions to terminate parental rights involuntarily, the Adoption Act requires the court to conduct a bifurcated analysis. ***See*** 23 Pa.C.S. § 2511(a) and (b). Courts first focus on the conduct of the parent, and, if the party seeking termination presents clear and convincing evidence that the parent's conduct meets one of the grounds for termination set forth in Section 2511(a), then the court will analyze whether termination of parental rights will meet the needs and welfare of the child, *i.e.*, the best interests of the child, as provided in Section 2511(b). Courts particularly focus on the existence of the child's bond with the parent, if any, and the potential effect on the child of severing such bond. ***In re L.M.****,* 923 A.2d 505, 511 (Pa. Super. 2007). A parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his parental duties, to the child's right to have proper parenting and fulfillment of the child's potential in a permanent, healthy, safe environment. ***In re B.N.M.****,* 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

While the court here found that CYS met its burden of proof under 23 Pa.C.S. § 2511(a)(1), (2), and (b), we need only agree with its decision as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm the termination of parental rights. ***See In re B.L.W.****,* 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

**Termination Pursuant to Section 2511(a)(2)**

We conclude that the court properly exercised its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2). Section 2511(a)(2) provides for termination of parental rights where the petitioner demonstrates by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2); *In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012) (citations omitted).

The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may also include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *Id.* At a termination hearing, the orphans' court may properly reject as untimely or disingenuous a parent's vow to follow through on necessary services when the parent failed to co-operate with the agency or take advantage of available services during dependency proceedings. *Id.* at 340.

Mother contends that there was insufficient evidence to support termination of her parental rights pursuant to Section 2511(a)(2) because the trial court did not consider the testimony and other evidence regarding her compliance with her family service plan goals in the six months prior to the filing of the termination Petition. Mother's Brief, at 6, 9-10. Mother does not dispute that for the seventeen months following the removal of the Children from her care, her compliance with the goals CYS set for her was inconsistent. *Id.* at 6, 8-9. She argues, however, that upon her release from incarceration in September of 2019, she changed her behaviors and consistently did whatever was necessary to have the Children returned to her. *Id.* Specifically, Mother states that she resumed her participation in the DRC, and successfully completed its program in March of 2020. *Id.* at 9. Further, Mother asserts that, prior to completing the DRC program, she had enrolled in separate drug and alcohol counseling at Skills in her hometown. *Id.* at 9. Thus, Mother concludes that the trial court's decision to terminate her parental rights is not supported by the clear and convincing evidence in the record. *Id.*, at 6, 9-10.

The trial court addressed the sufficiency of the evidence supporting termination pursuant to Section 2511(a)(2) as follows:

> [Mother] did not deny the presence of over 10,000 empty stamp bags in her residence when she overdosed, and when questioned by this [c]ourt, said she had spent over $50,000 on illegal drugs. Formerly a nurse with a master's degree, she lost her nursing license and is currently employed at a McDonald's. She has made progress, but in this [c]ourt's opinion, she is not ready or able to

raise [C]hild, now four and a half years old, who has been in placement not for 30 months.  According to [Mr. Nelson's report]:

> Throughout [CYS]'s involvement, there continued to be a pattern of denial and acceptance of drug and alcohol issues, inability to maintain uncluttered and stable housing, and lack of cooperation . . . .  She has ongoingly failed to demonstrate that she could provide her child with a clean, safe environment.  As of most recently on June 12, 2020 when [CYS] served [M.P.] [Mother] notice of the termination of parental rights hearing, her home appeared cluttered and she would not permit the [CYS] into the home.

 [Mr. Nelson] was concerned that if [C]hild was returned, [C]hild's safety could not be assured.  On the contrary, while in placement, [C]hild is thriving. . . . This[c]ourt] is concerned with the safety of [C]hild should [Child] be returned.  Photos of [Mother's]former home are telling.  The drug overdose, the denial of a drug problem for so long contrasted with [C]hild doing so well in placement leads this [c]ourt to believe that the involuntary termination must be granted.  How long must [C]hild wait for [M]other to mend her ways?  As stated in the best interest statement:

> If the Honorable court grants the Petition to Involuntarily Terminate the Parental Rights of [Mother], then [Child] will be afforded the opportunity to achieve permanency through adoption.  The child will have the opportunity to be raised by a family who is capable of meeting all of his physical, mental, emotional, moral, social, educational, safety, and medical needs.

The [c]ourt finds, by clear and convincing evidence, that CYS has established a legal basis for terminating the parental rights of [Mother]. . . . Much of [Mother's] improvement has occurred within the six months immediately preceding the filing of the Petition and is not considered by the court.

Trial Court Order, 7/29/20, at 13-15 (quotation marks omitted).

Our review of the record supports the trial court's findings.  At the time of the termination hearing, Child had been in care for more than two and a

half years. Moreover, Child was in care for seventeen months before Mother's incarceration prompted her to actively address her drug addiction. To the extent Mother asserts that she has remedied her inability to parent Child, the trial court emphasized in its findings that, throughout CYS's involvement, Mother continued to exhibit a pattern of denying her drug and alcohol issues, an inability to maintain uncluttered and stable housing, and a lack of cooperation. Mother's denial of access to her home as recently as June 2020 belies her assertion that she has been cooperative with CYS and has prepared a clean, safe, and stable environment in which to parent Child.

Mother's efforts at the last hour fall short of the well-established requirement for a parent to make diligent efforts towards the prompt assumption of full parental responsibilities. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Notwithstanding Mother's eventual steps taken to address her drug and alcohol problems, the evidence of record supports the orphans' court's findings and its determination that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being[.]" 23 Pa.C.S.

§2511(a)(2). Our standard of review, thus, requires that we affirm the trial court's determination.[5]

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/26/2021

---

[5] Mother did not challenge the orphans' court's consideration of Section 2511(b) and its determination that, although Child has a bond with Mother, the termination of that bond is in the Child's bests interests in order to provide stability and security in Child's pre-adoptive home where he has been since February 2018. Our review of the record supports that determination.